Michael R. Lozeau (CA State Bar No. 142893)
Brian B. Flynn (CA State Bar No. 314005)
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
        brian@lozeaudrury.com

M. Benjamin Eichenberg (CA State Bar No. 270893)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, CA 94612
Tel:  (510) 735-9700
Fax: (510) 735-9160
E-mail: ben@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, a United States Government Agency; MARTHA WILLIAMS, in her official capacity as Acting Director of U.S. Fish and Wildlife Service; and DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior;<br><br>Defendants. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Administrative Procedure Act, Endangered Species Act) |

COMPLAINT

1  Plaintiff SAN FRANCISCO BAYKEEPER ("Baykeeper"), by and through its counsel, alleges
2  as follows:

### INTRODUCTION

3

4  1.    Baykeeper brings this action for declaratory and injunctive relief against the UNITED
5  STATES FISH AND WILDLIFE SERVICE ("Service"), MARTHA WILLIAMS in her official
6  capacity as Acting Director of U.S. Fish and Wildlife Service, and DEB HAALAND in her official
7  capacity as U.S. Secretary of the Interior, (collectively, "Defendants") pursuant to the judicial review
8  provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 and 16 U.S.C.
9  1533(B)(3)(C)(ii).

10  2.    Baykeeper seeks a declaratory judgment, injunctive relief, and the award of costs,
11  including reasonable attorneys' fees, for Defendants' determinations in the Service's most recent
12  Candidate Notice of Review published on November 16, 2020 ("2020 CNOR"), 85 Fed. Reg. 73164-
13  73179, that the Longfin Smelt (*Spirinchus thaleichthys*) (San Francisco Bay-Delta distinct vertebrate
14  population segment) ("Longfin Smelt DPS") warranted listing as either an endangered or threatened
15  species under the Endangered Species Act ("ESA") but (1) that listing of the Longfin Smelt DPS was
16  precluded by higher priority listing actions and (2) that expeditious progress is being made by the
17  Service to add or remove species from the endangered and threatened species lists.

18  3.    The Longfin Smelt DPS is on the brink of extinction. The Service has recognized the
19  dire plight of the Longfin Smelt DPS since 2012 when, after several years of litigation, the agency
20  determined that listing was warranted. However, beginning in 2012 and carrying forward through the
21  2020 CNOR, Defendants have claimed that listing the Longfin Smelt DPS has been precluded by other
22  pending listing proposals. As a result, the Longfin Smelt DPS has languished on the Service's listing
23  candidate list for almost a decade. During that time, none of the safeguards and protections afforded
24  listed species under ESA have been brought to bear on the dramatic social and environmental forces
25  that continue to drive the Longfin Smelt's slide toward extinction.

26  4.    Beginning in 2016, the Service has announced its intention to complete the listing
27  process for the Longfin Smelt DPS by specific fiscal years. As each of those fiscal years has come and

28

COMPLAINT                                                                                          1

gone, the Service has repeatedly pushed off completing the listing. In its 2016 Workplan, the Service scheduled the listing to be completed by FY 2019. In its 2019 Workplan, the Service indicated it would finish the Longfin Smelt listing by FY 2020 and included the work in its budget at that time. However, in 2020, its workplan pushed off the listing for another two years until FY 2022. Given the Service's budgeting and rulemaking priority for the Longfin Smelt, the Service has failed to show how other higher priority listings could have caused the most recent delay.

5.    Nor can the delay in listing the Longfin Smelt be justified by the required showing under ESA that the Service is making expeditious progress in adding qualified species to the endangered and threatened lists or removing successfully protected species. Instead, over the last four years, the average number of species for which final listing actions were completed by the Service has dropped precipitously by over 80 percent from the preceding five-year period. The average number of species for which the Service has issued 90-day findings on petitions for listing has dropped by over 90 percent during those same time periods. Looking at the rate of all species-specific listing actions, the number of actions between 2017 and 2020 dramatically declined by over 77 percent. Slower progress is not expeditious progress.

6.    By arbitrarily delaying the listing of the Longfin Smelt, Defendants are denying the Longfin Smelt the only protections capable of counteracting the powerful interests arrayed against this critically endangered fish. Whether the Longfin Smelt will be extirpated from the San Francisco Bay Estuary is directly related to whether various resource agencies will be required to allow sufficient water flows through the Sacramento-San Joaquin River Delta. As long as Defendants continue to arbitrarily delay adding the Longfin Smelt to the threatened or endangered lists, the powerful entities and interests that are diverting and diminishing the Smelt's aquatic habitat will continue to also drive the Longfin Smelt further towards extermination.

7.    Plaintiff Baykeeper brings this lawsuit to challenge Defendants' unjustified delay in providing the full protections of ESA to the Longfin Smelt.

COMPLAINT                                                                              2

**JURISDICTION AND VENUE**

8.      This action is brought pursuant to the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2201 (declaratory relief).

9.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) as Baykeeper is incorporated in California and its headquarters are located within the district, Baykeeper's members reside in this district, and no real property is involved in this action.

**INTRADISTRICT ASSIGNMENT**

10.     Intradistrict assignment of this matter to the Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(e) because the events or omissions which give rise to Baykeeper's claims occurred in Alameda County.

**PARTIES**

11.     Plaintiff SAN FRANCISCO BAYKEEPER is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1736 Franklin Street, Suite 800, Oakland, California, 94612.

12.     Baykeeper has approximately 5,000 members and supporters who live and/or recreate in and around the San Francisco Bay area. Baykeeper's mission is to defend San Francisco Bay from the biggest threats and hold polluters and government agencies accountable to create healthier communities and help wildlife thrive. Baykeeper patrols on the water, investigates and stops polluters, and strengthens laws that protect the Bay.  Baykeeper is dedicated to preserving, protecting, and defending the environment, wildlife, and natural resources of San Francisco Bay and its tributaries for the benefit of its ecosystems and communities. Baykeeper furthers its goals through education, advocacy, restoration, and directly initiates enforcement of environmental laws on behalf of itself and its members.

13.     Baykeeper and its members are concerned with, and have concrete interests in, the conservation of imperiled species, including the Longfin Smelt DPS.

14.     On behalf of itself and its members, Baykeeper has an interest in the effective implementation of the ESA and the timely listing of endangered or threatened species, including the

timely listing of imperiled species for which listing petitions have been submitted.

15.     Baykeeper's members include citizens, taxpayers, property owners, and residents, with recreational, educational, scientific, conservation, aesthetic, and/or spiritual interests in the species at issue in this suit and are similarly interested in the health of these species' habitat.

16.     The interests of Baykeeper and its members in the Longfin Smelt DPS and its habitat are dependent upon the persistence of healthy and sustainable populations of the species in the wild. Unless the Longfin Smelt DPS is promptly protected under the ESA, it will continue to decline and likely will go extinct. Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to protect the Longfin Smelt DPS under the ESA.

17.     Defendants' failure to protect the Longfin Smelt DPS under the ESA is also subverting Baykeeper's core mission to protect the Bay and its wildlife. As a consequence of Defendant's unlawful delay in protecting Longfin Smelt, Baykeeper has been compelled to expend resources (exclusive of this litigation) on alternative means of protecting the species, which has diverted time and resources that could and would have been spent on other activities that are central to Baykeeper's mission.

18.     Continuing commission of the acts and omissions alleged herein will irreparably harm Baykeeper and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

19.     Baykeeper has one or more members who use, explore, research, and recreate in areas impacted by the Longfin Smelt DPS decision herein at issue and could sue in their own right. Baykeeper's members are suffering recreational, aesthetic, scientific, conservational, or other environmental injuries due to Defendants' unlawful decision and delay in adding the Longfin Smelt to the ESA's endangered or threatened species list. Baykeeper has one or more members that endeavor to observe Longfin Smelt and have ongoing interests in the species and its habitat. Baykeeper has one or more members who have concrete plans to visit these species' habitats and try to observe them. Defendants' actions have harmed and continue to harm Baykeeper's members' interests in observing,

studying, and otherwise enjoying the species and their habitats. Baykeeper's injuries-in-fact are fairly traceable to Defendants' conduct and would be redressed by the requested relief.

20.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency of the U.S. Department of the Interior, charged by the U.S. Department of the Interior with administering the ESA with respect to listing threatened and endangered plant and animal species.

21.     Defendant MARTHA WILLIAMS is the Principal Deputy Director of the U.S. Fish and Wildlife Service, the agency within the Department of the Interior that is charged with implementing the ESA for the species at issue in this suit. Deputy Director Williams is designated to exercise the delegable authority of the Director. The Secretary has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b). The prior Director signed the 2020 CNOR. Acting Director Williams is sued in her official capacity.

22.     Defendant DEB HAALAND is the Secretary of the Department of the Interior and is the federal official in whom the ESA vests final responsibility for making decisions and promulgating regulations required by and in accordance with the ESA, including listing decisions. Secretary Haaland is sued in her official capacity.

## LEGAL BACKGROUND

### The Endangered Species Act

23.     The ESA is a comprehensive federal statute declaring that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id*. § 1531(b).

24.     When enacting the ESA, Congress declared that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C § 1531(c)(1). Congress further specifically mandated that the Secretary "review other programs administered by him and utilize such programs in

furtherance of the purposes of this Act." *Id.* § 1536(a)(1).

25.     The ESA has a suite of substantive legal protections that apply to "species," 16 U.S.C §

1532(16) (defining "species"), once they are listed as endangered or threatened. For example, ESA

section 7(a)(2) requires all federal agencies to ensure that their actions do not "jeopardize the

continued existence" of any endangered or threatened species or "result in the destruction or adverse

modification" of any listed species' "critical habitat." *Id.* § 1536(a)(2). ESA section 9 prohibits, among

other actions, "any person" from "taking" protected animals without lawful authorization from the

Service. *Id.* §§ 1538(a)(1)(B), 1539. Other provisions require the Service to designate "critical habitat"

for listed species, *id.* § 1533(a)(3); require the Service to "develop and implement" recovery plans for

listed species, *id.* § 1533(f); authorize the Service to acquire land for the protection of listed species,

*id.* § 1534; and authorize the Service to make federal funds available to states in order to assist in the

conservation of endangered and threatened species, *id.* § 1535(d).

### Listing Species as Endangered or Threatened Under the ESA

26.     Section 4 of the ESA requires that the Service list species as "endangered" or

"threatened" if one or more of five listing factors is met—such as the present or threatened destruction

of habitat—based on the best available science. 16 U.S.C § 1533(a)(1), (b)(1)(A). "The term

'endangered species' means any species which is in danger of extinction throughout all or a significant

portion of its range[,]" *id*. § 1532(6), while "[t]he term 'threatened species' means any species which

is likely to become an endangered species within the foreseeable future throughout all or a significant

portion of its range." *Id*. § 1532(20).

27.     To ensure that listing decisions are timely, Section 4 of the ESA sets forth a detailed

process and timetable whereby interested persons may petition the Service to list a species as

endangered or threatened. This process includes nondiscretionary deadlines that require the Service to

make up to three decisions in response to listing petitions within prescribed time frames. These three

findings, described below, are the 90-day finding, the 12-month finding, and the final listing

determination. 16 U.S.C § 1533(b)(3)-(6).

28.     Within 90 days of receipt of a listing petition, the Service must, "to the maximum

extent practicable," make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A).

29.     If the Service determines in this "90-day finding" that the petition does not present substantial information indicating that listing may be warranted, the petition is denied and the process concludes.

30.     If the Service determines that a petition does present substantial information indicating that listing "may be warranted," the agency must publish that finding and proceed with a scientific review of the species' status, which is known as a "status review." 16 U.S.C. § 1533(b)(3)(A).

31.     Upon completion of the status review, and within one year from the date that it receives the petition, the Service must make a "12-month finding" with one of three determinations: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded." 16 U.S.C § 1533(b)(3)(B).

32.     When the Service determines that a listing is "warranted but precluded," the Service must find (1) that the listing "is precluded by pending proposals to determine whether any species is an endangered species or a threatened species" and (2) that "expeditious progress is being made to add qualified species . . . and to remove from such lists species for which the protections of this chapter are no longer necessary." 16 U.S.C § 1533(b)(3)(B)(iii). "[T]he Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based." *Id.*

33.     "The Secretary may make a 'warranted but precluded' finding only in narrow circumstances." *Wildwest Institute v. Kurth*, 855 F.3d 995, 1005 (9th Cir. 2017). The warranted action "must be precluded by pending proposals *and* expeditious progress must be being made to list qualified species and delist those for whom ESA's protections are no longer necessary." *Ctr. for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1102 (9th Cir. 2006) (emphasis in original); *see also* 16 U.S.C. § 1533(b)(3)(B)(iii). The Service "must show that [it] is 'actively working on other listings and delistings and must determine and publish a finding that such work has resulted in pending

COMPLAINT                                                                                                    7

proposals which *actually* preclude[ ] [the Service] proposing the petitioned action at that time.' " *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 838 (9th Cir. 2001) ("*Gila Chub*") (emphasis in original) (quoting H.R. Rep. No. 97-835, at 22 (1982) (Conf. Rep.)); *see also Wildwest Institute*, 855 F.3d at 1008; *Kempthorne*, 466 F.3d at 1102. The Service must "determine and present evidence that [it] is, in fact, making expeditious progress in the process of listing and delisting other species." *Gila Chub*, 254 F.3d at 838 (quoting H. Rep. No. 97-835 at 22); *see also Wildwest Institute*, 855 F.3d at 1008; *Kempthorne*, 466 F.3d at 1102. "In cases challenging the Secretary's claim of inability to propose an otherwise warranted petitioned action, the court will, in essence, be called on to separate justifications grounded in the purposes of the act from the foot-dragging efforts of a delinquent agency." H. Rep. No. 97-835, at 22.

34.     If the Service determines that a petition to list a species is "warranted but precluded" by other "pending proposals to determine whether any species" is endangered or threatened, the petition must "be treated as a petition that is resubmitted to the [Service] . . . on the date of such finding." 16 U.S.C. § 1533(b)(3)(C)(i). Hence, the ESA requires the Service to make a new determination within one year as to whether the species should be listed or instead may again be denied the Act's protections on the grounds that its listing is "precluded" by other pending listing actions. *Id*. The Service commonly refers to new findings on previously filed petitions as "recycled petition findings," and they are included in a "Candidate Notice of Review" ("CNOR") published approximately annually by the Service.

35.     The ESA provides that any "warranted but precluded" finding "shall be subject to judicial review." 16 U.S.C. § 1533(b)(3)(C)(ii).

36.     Although the Service acknowledges that listing all candidates is warranted based on the best available data—i.e., such species need the protections of the Act to avoid near- or long-term extinction—candidates that are not listed do not receive the extensive safeguards of the ESA.

### Judicial Review under the APA

37.     The APA governs judicial review of a "warranted but precluded" determination made pursuant to ESA, 16 U.S.C § 1533(b)(3)(B)(iii). The APA provides a right of judicial review to

persons "adversely affected or aggrieved by an agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702.

38.     Under the APA, an agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review under the APA requires a court to determine "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotations omitted).

## FACTUAL BACKGROUND

### The Longfin Smelt

39.     The Longfin Smelt is a semi-anadromous fish found in Pacific Coast bay, estuary, and nearshore coastal environments, from San Francisco Bay north to Cook Inlet, in south-central Alaska. The San Francisco Bay Estuary ("Estuary") supports the largest Longfin Smelt population in California, which is also a distinct population segment, and the species is a key part of the estuarine food web. Longfin Smelt were once one of the most abundant open-water fishes in the Estuary and were fished commercially. In recent years, the species' numbers have plummeted to record lows in the Estuary, and it is thought to be extirpated or nearing extirpation in other Northern California estuaries.

40.     Catastrophic declines in the Longfin Smelt population have been caused by poor management of the Estuary by Federal and State water regulators, which have allowed excessive water diversions and drastically reduced freshwater flow into San Francisco Bay. During the 1987-1992 drought, which coincided with a period of relatively large water diversions and exports from the Estuary and its watershed, Longfin Smelt abundance declined dramatically, reaching historically low levels in the early 1990s. The species partially recovered during the mid-to-late 1990s, when hydrological conditions improved, but the population decline resumed when dry conditions and increased water diversions prevailed during the early part of this century. The Estuary's Longfin Smelt population reached a record low in 2015. Longfin Smelt abundance in 2020 (the most recent year of sampling) was less than 0.1 percent of the levels detected when sampling began in 1967, and the

COMPLAINT                                                                                                9

population has declined approximately 80 percent since it was listed as threatened by the State of California in 2009.

41.    Longfin Smelt population abundance in the Estuary is directly related to the amount of fresh water flowing out of the Delta (a.k.a., Delta outflow) during the winter and spring. In years when winter and spring flows are high, Longfin Smelt have better juvenile recruitment success and relatively high population abundance, as measured later in the year, while low winter-spring flows strongly correspond to declines in abundance. Longfin Smelt are about to be extirpated from the Estuary, and the only thing that will save the species is quick, decisive action to keep enough water flowing out of the Delta to allow the smelt to survive.

**Delays by the Service to List the Longfin Smelt as Endangered or Threatened**

42.    In November 1992, San Francisco Baykeeper and seven other organizations filed the original petition requesting the Service to list the Longfin Smelt DPS. On June 24, 1993, the Service published a 90-day finding that the petition presented substantial information indicating that the requested action may be warranted and triggering a formal status review for the Longfin Smelt. 58 Fed. Reg. 36184 (July 6, 1993). The Service then concluded that the Longfin Smelt DPS was not a distinct population segment and the original petition was ultimately denied.

43.    In 2007, several organizations petitioned the Service to list the Longfin Smelt DPS as endangered under the federal ESA. Initially, the Service responded by denying federal protection to the Longfin Smelt DPS while promising to look at the status of the species as a whole.

44.    In 2009, several organizations sued the Service for its denial, and in 2011, the Service announced it would rethink its decision on the Longfin Smelt DPS.

45.    In 2012, the Service determined that the Longfin Smelt DPS was a distinct population segment and that protection of this population was warranted but listing was precluded because the listing of other species was a higher priority. 77 Fed. Reg. 19756 (Apr. 2, 2012). Thus, the Service added the Longfin Smelt DPS to the "candidate" list.

46.    Since 2012, the Longfin Smelt DPS has remained on the candidate list. The Service has taken no further action to reconsider or move the listing forward. Instead, the Service has repeatedly

found, in every year, that protection of the Longfin Smelt DPS is warranted under the ESA, but (1) that such protection is precluded by other pending listing determinations and (2) that the Service is making expeditious progress to add or remove other species from the lists.

47.     In September 2016, the Service released its National Listing Workplan ("2016 Workplan") for the subsequent seven-year period. The 2016 Workplan identified the Longfin Smelt DPS as one of 11 candidate species for listing that would either be proposed for listing or found not warranted for listing during FY 2019.

48.     In May 2019, the Service released its National Listing Workplan ("2019 Workplan") for the subsequent five-year period. The 2019 Workplan indicated that 12-month findings for 62 identified species would be completed by FY 2020. The Service failed to complete the 12-month findings in FY 2020 for 19 of those 62 species and instead has now further delayed them until FY 2021 for 15 of those species and until FY 2022 for 4 of the species.

49.     The 2019 Workplan identified the Longfin Smelt DPS as one of 11 candidate species ("2020 Candidate Species") for listing that would either be proposed for listing or found not warranted for listing during FY 2020.

50.     On November 6, 2019, the Service e-mailed a notice of status review to parties who had indicated an interest in the Longfin Smelt. The Service stated that it "has been gathering and analyzing available information about the Longfin Smelt DPS to assist us in making a listing determination." The notice indicated that "[t]he Bay-Delta Fish and Wildlife Office is the lead field office working on the status review of the Longfin Smelt Bay-Delta DPS." The notice further stated that, "[a]t this time, we expect the proposed listing rule will be delivered to the Federal Register no later than September 2020."

51.     On November 16, 2020, the Service published its Candidate Notice of Review ("2020 CNOR") to "present an updated list of domestic plant and animal species that [the Service] regard[s] as candidates for or have proposed for addition to the Lists of Endangered and Threatened Wildlife and Plants under the Endangered Species Act of 1973." 85 Fed. Reg. 73164.

52.     The 2020 CNOR concluded that all eleven of the 2020 Candidate Species, including the

COMPLAINT                                                                                          11

Longfin Smelt DPS, warranted protection under the ESA, but (1) that such protection was precluded by other pending listing determinations and (2) that the Service is making expeditious progress to add or remove other species from the lists.

53.     According to the 2020 CNOR, new proposed listing rules or not warranted findings remained incomplete as of September 30, 2020 for five of the 11 candidate species (45%), including the Longfin Smelt DPS, identified in the 2019 Workplan.

54.     The 2020 CNOR identified three of the above five species as "Candidates in Review" for which the Service has "funded these actions and intend[s] to complete [its] classification decision in the near future." 85 Fed. Reg. 73175.

55.     The 2020 CNOR stated that the planned work for the Longfin Smelt DPS listing action was funded and initiated but not completed as of September 30, 2020. 85 Fed. Reg. 73171.

56.     The 2020 CNOR listed the following factors that the Service applied in determining whether a listing is warranted but precluded by other pending listing actions: "(1) The amount of resources available for completing the listing function, (2) the estimated cost of completing the proposed listing regulation, and (3) the Service's workload, along with the Service's prioritization of the proposed listing regulation, in relation to other actions in its workload." 85 Fed. Reg. 731167.

57.     The 2020 CNOR did not explain—in general or in a focused discussion of the Longfin Smelt DPS—how the above factors affected the Service's completion of a listing rule for the Longfin Smelt DPS given its placement on the 2019 Workplan and prior decisions by the Service to budget funds for such work.

58.     The 2020 CNOR discussed how "the amount of resources available for completing the listing function" supported preclusion by focusing on the Service's overall budget for listing actions and its general insufficiency. 85 Fed. Reg. 73167. However, the 2020 CNOR did not explain how the Service's overall budget precluded a listing rule for the Longfin Smelt, especially given that the Service funded the work for completion in FY 2020. The 2020 CNOR provided no evidence that budget restrictions precluded listing the Longfin Smelt DPS, which had previously been budgeted according to the 2020 CNOR and 2019 Workplan.

COMPLAINT                                                                                          12

59.     The 2020 CNOR discussed how "the estimated cost of completing the proposed listing regulation" supported preclusion by generally identifying the types of activities that go into a listing rulemaking. 85 Fed. Reg. 73617-73618. However, the discussion did not provide any detail regarding the cost of such activities. The 2020 CNOR provided no basis for a conclusion that the Service's budget precluded listing of the Longfin Smelt DPS, especially given that the Service had estimated in the 2019 Workplan that the proposed listing rule for the Longfin Smelt DPS would be completed by September 2020.

60.     The 2020 CNOR discussed how "the Service's workload, along with the Service's prioritization of the proposed listing regulation, in relation to other actions in its workload" supported preclusion by focusing on the 2019 Workplan. 85 Fed. Reg. 73168-73169. The 2020 CNOR explained, "For FY 2020, [the 2019 Workplan] includes 74 12-month findings or proposed listing actions that are at various stages of completion at the time of this finding." 85 Fed. Reg. 73168. However, one of the 74 findings or proposed listing actions in the 2019 Workplan was specifically to promulgate a rule for the Longfin Smelt DPS by September 30, 2020. The CNOR provided no explanation of how the Service's workload in relation the 2019 Workplan—which prioritized a listing rule for the Longfin Smelt DPS by September 30, 2020—precluded the Service from issuing a proposed listing rule for the Longfin Smelt DPS.

61.     The 2020 CNOR discussed the reasoning behind the Service's assignment of listing priority number ("LPN") 6 to the Longfin Smelt DPS. 85 Fed. Reg. 73173-73174. However, the discussion did not offer any relevant explanation as to how the LPN assigned to the Longfin Smelt DPS related to preclusion by other pending endangered or threatened determinations.

62.     The 2020 CNOR assumed that any progress by the Service in listing or delisting species supported the necessary expeditious progress finding pursuant to 16 U.S.C. 1533(b)(3)(B)(iii)(II). However, on information and belief, Baykeeper alleges that (1) the Service published Federal Register notices describing actions to list, delist, or change listing designation of imperiled species for FY 2017-FY 2020 at 58.5% the rate it did for FY 2012-FY 2016; (2) the Service published an average of 25.5 Federal Register notices per year for FY 2017-FY 2020 compared to 43.6

notices per year for FY 2012-FY 2016; (3) the rate at which the Service published Federal Register notices with final listing rules for FY 2017-FY 2020 declined by 40.5 percent compared to the rate for FY 2012-FY 2016; (4) there was a 66.2 percent reduction in the number of Federal Register notices for 90-day findings for FY 2017-FY 2020 as compared to FY 2012-FY 2016; (5) the rate of the Service's species-specific listing activities (i.e., accounting for the number of species described in each Federal Register notice) for FY 2017- FY 2020 declined by 77.1% as compared to FY 2012-FY 2016; (6) the rate of species-specific 90-day findings for FY 2017- FY 2020 declined by 94.5% as compared to FY 2012-FY 2016; (7) the rate of species-specific final listing rules for FY 2017- FY 2020 declined by over 80% as compared to FY 2012-FY 2016. The 2020 CNOR did not acknowledge the dramatic reduction in the Service's listing activity nor did it provide any explanation, reasons, or data explaining how this pattern affects the Service's expeditious progress finding.

63.     The number of species that lose protections under the ESA cannot, by itself, support a "warranted but precluded" finding, which requires the Service to demonstrate that it is making "expeditious progress" both in adding species to the lists of endangered and threatened species and in removing any recovered species from the list. 16 U.S.C. § 1533(b)(3)(B)(iii)(II).

64.     The 2020 CNOR did not explain how the budget constraints claimed by the Service resulted in the significant deceleration of the Service's listing and delisting activities. On information and belief, Baykeeper alleges that the Service's average annual budget cap for listing activities was $19,492,250 for FY2017-FY 2020 compared to $20,688,800 for FY 20120 FY 2016, a reduction of approximately 5.8%. This reduction in the listing budget does not account for the much larger decline in listing actions. Actions either to delist or downlist species are not subject to the same budget as listing actions, as they are funded through a separate recovery line item in the federal budget. 85 Fed. Reg. 73619. Nor are delisting and downlisting activities included in the Service's prioritization of listing actions. *Id*. at 73168. On information and belief, Baykeeper alleges that the Service's listing-related actions (excluding delisting and downlisting actions) declined by 57% for FY 2017-FY 2020 as compared to FY 2012- FY 2016 and the number of species-specific actions (excluding delisting and downlisting actions) declined by 79.9% for FY 2017-FY 2020 as compared to FY 2012- FY 2016.

COMPLAINT                                                                                                    14

65.     The 2020 CNOR did not explain why actions in the 2019 Workplan were not completed, despite an increase in the FY 2020 Congressional cap on listing activities. The 2020 CNOR reports a total budget cap of $20,318,000 for all foreign and domestic listing work in FY 2020. On information and belief, Baykeeper alleges that the listing budget cap for FY 2020 was exactly two million dollars more than the cap in the previous year (representing a year-to-year increase in the Congressional spending cap of 10.9%), and yet the Service still did not accomplish the actions it proposed in the 2019 Workplan for completion during FY 2020.

66.     On information and belief, Baykeeper also alleges that the administrative record for the 2020 CNOR does not contain evidence establishing that a rulemaking for the Longfin Smelt DPS was precluded by other pending proposals to determine the endangered or threatened status of other species. The Service fails to detail what higher priority species preclude "the immediate proposal and timely promulgation of a final" listing determination for the Longfin Smelt. 16 U.S.C. § 1533(b)(3)(B)(iii)(I). Moreover, the Service had prioritized the Longfin Smelt for completing the rulemaking decision by budgeting the work and establishing a schedule in the 2019 Workplan to publish the proposed rule by September 30, 2020. On information and belief, Baykeeper alleges that, as of September 2020, the Service had made progress on preparing a proposed rulemaking for the Longfin Smelt DPS and that only modest additional effort should have been necessary to complete a rulemaking package prior to September 30, 2020.

67.     By letter dated March 8, 2021, Baykeeper provided the Service and U.S. Department of the Interior with written notice of their arbitrary decision and inadequate reasons and data pursuant to the requirements of the APA and ESA and notified the Service and U.S. Department of the Interior of Baykeeper's intent to file this suit. A true and correct copy of Baykeeper's March 8, 2021 notice letter to the Service and U.S. Department of the Interior is attached as Exhibit A.

///

///

///

///

COMPLAINT                                                                          15

1

2

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Arbitrary and Capricious Finding by Defendants That Listing the Longfin**
**Smelt DPS Was Warranted But Precluded by Pending Listing Proposals**
**(Violation of APA, 5 U.S.C. § 706(2)(A))**

68.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

69.     In the 2020 CNOR, Defendants found, pursuant to ESA, 16 U.S.C. § 1533(b)(3)(B)(iii)(I), that the listing of the Longfin Smelt DPS was warranted but precluded by pending listing proposals.

70.     Defendants' finding that the listing of the Longfin Smelt DPS was precluded by pending listing proposals was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

(A)     The 2020 CNOR fails to provide a reasonable evaluation of the reasons and supporting data showing that a final rulemaking to list the Longfin Smelt DPS was actually precluded by other pending proposals.

(B)     The 2020 CNOR fails to show that the Service is actively working on other listing and delistings that actually precluded the listing of the Longfin Smelt DPS.

(C)     Defendants failed to consider the relevant factors or articulate a rational connection in finding that the Service's overall budget precluded listing the Longfin Smelt DPS given that the Service had funded the listing costs for the Longfin Smelt DPS for FY 2020;

(D)     Defendants failed to consider the relevant factors or articulate a rational connection in finding that the Service's workload precluded listing the Longfin Smelt DPS given that the 2019 Workplan prioritized a listing rule for the Longfin Smelt DPS by September 30, 2020;

(E)     Defendants failed to consider the relevant factors or articulate a rational connection in finding that the different types of listing actions precluded the promulgation of a rule to list the Longfin Smelt DPS given that the Service provided no details as to the cost of

COMPLAINT                                                                                        16

the different listing actions;

(F)    Defendants failed to consider the relevant factors or articulate a rational connection in finding that the LPN assigned to the Longfin Smelt DPS precluded listing the Longfin Smelt DPS;

71.    Alternatively, Defendants' 2020 CNOR determination that listing the Longfin Smelt DPS is precluded is arbitrary and capricious and an abuse of discretion because the 2020 CNOR's evaluation, reasons, and data are not supported by evidence in the administrative record and/or the determination relied upon factors not authorized by ESA.

<u>SECOND CAUSE OF ACTION</u>
**Arbitrary and Capricious Finding by the Service That Expeditious Progress is Being Made to List and Remove Species under the Endangered Species Act (Violation of APA, 5 U.S.C. § 706(2)(A))**

72.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

73.    In the 2020 CNOR, the Service found pursuant to 16 U.S.C § 1533(b)(3)(B)(iii)(II) that "expeditious progress is being made to add qualified species . . . and to remove from such lists species for which the protections of this chapter are no longer necessary."

74.    The Service's finding that expeditious progress is being made to list and remove species under the ESA was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

(A)    The 2020 CNOR fails to provide a reasonable evaluation of the reasons and supporting data showing that expeditious progress was being made.

(B)    The Service failed to consider the relevant factors or articulate a rational connection in finding that the Service is making expeditious progress despite the decline in listing and delisting activities for FY 2017- FY 2020 compared to FY 2012 - FY 2016;

(C)    The Service failed to consider the relevant factors or articulate a rational connection between the budget constraints claimed by the Service and the significant deceleration of the Service's listing and delisting activities;

(D)    The Service failed to consider the relevant factors or articulate a rational connection between the increase in the Service's listing budget for FY 2020 and the Service's failure to complete the actions prioritized in the 2019 Workplan;

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests this Court to grant the following relief:

(A)    Declare that Defendants' finding that the listing of the Longfin Smelt under the ESA was precluded by pending listing actions was arbitrary, capricious, and not in accordance with law;

(B)    Declare that Defendants' finding that expeditious progress is being made to list and remove species under the ESA was arbitrary, capricious, and not in accordance with law;

(C)    Set aside the findings of 2020 CNOR regarding the Longfin Smelt DPS and remand to the Service with instructions to immediately issue a proposed listing rule for the Longfin Smelt DPS by a date certain and to adopt a final listing rule for the Longfin Smelt DPS by a date certain;

(D)    Award Baykeeper its costs of litigation, including its reasonable attorneys' fees, pursuant to 28 U.S.C. § 2412;

(E)    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: April 8, 2021                      LOZEAU DRURY LLP

Michael R. Lozeau
Attorneys for Plaintiff

COMPLAINT                                            18

# EXHIBIT A



LOZEAU DRURY LLP          T 510.836.4200    1939 Harrison Street, Ste. 150    www.lozeaudrury.com
                         F 510.836.4205    Oakland, CA 94612                michael@lozeaudrury.com

March 8, 2021                              VIA CERTIFIED MAIL

Scott de la Vega                           Gary Frazer
Acting Secretary of the Interior           Assistant Director for Ecological Services
U.S. Department of the Interior            U.S. Fish and Wildlife Service
1849 C Street, N.W.                        1849 C Street, N.W.
Washington, D.C.  20240                    Washington, D.C.  20240


Director                                   Caitlin Snyder, Chief
Martha Williams, Principal Deputy          Branch of Domestic Listing
Director                                   U.S. Fish and Wildlife Service, MS: ES
U.S. Fish and Wildlife Service             5275 Leesburg Pike
1849 C Street, N.W.                        Falls Church, VA 22041–3803
Washington, D.C.  20240

Re:    Notice of San Francisco Baykeeper's Intent to Sue the Department of the Interior
       and United States Fish & Wildlife Service to Remedy Abuse of Discretion in
       Finding That the Listing of the Longfin Smelt is Warranted but Precluded.

Dear Acting Secretary de la Vega, the Director of the Fish & Wildlife Service, Principal
Deputy Director Williams, and Assistant Director Frazer:

        I am writing on behalf of San Francisco Baykeeper in regard to the Secretary's and
U.S. Fish and Wildlife Service's (collectively "Service") most recent candidate Notice of
Review published on November 16, 2020 ("2020 CNOR") and the determinations that (1)
the Longfin Smelt (*Spirinchus thaleichthys*) (San Francisco Bay-Delta distinct vertebrate
population segment) warranted listing as either an endangered or threatened species
under the Endangered Species Act ("ESA") but that, pursuant to 16 U.S.C. §
1533(b)(3)(B), listing was precluded by higher priority listing actions, and (2) that
expeditious progress is being made by the Service to add or remove species from the
endangered and threatened species lists. 85 Fed. Reg. 73164-73179 (Nov. 16, 2020). To
the extent any notice may be required by ESA, 16 U.S.C. § 1540(g)(2)(C), this notice
satisfies those requirements. However, because Baykeeper is challenging the Service's
discretionary decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et
seq.*, section 1540(g)(2)(C) does not apply. As a result, Baykeeper need not await 60-
days to file the action described in this notice.

        Baykeeper is a non-profit 501(c)(3) environmental organization, organized under
the laws of California with its office at 1736 Franklin Street, Suite 800, Oakland, California
94612. Baykeeper's telephone number is (510) 735-9700. Baykeeper has approximately
5,000 members and supporters, including many who live and/or recreate in and on San
Francisco Bay, including the Sacramento-San Joaquin River Delta. Baykeeper's mission
is to defend the San Francisco Bay and its delta from the biggest threats and hold

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 2 of 12

polluters and government agencies accountable to create healthier communities and help wildlife thrive. Dr. Jonathan Rosenfield is a Senior Scientist with Baykeeper and a leading expert on the Longfin Smelt. Dr. Rosenfield assisted in preparing the 2007 petition to list the Longfin Smelt and has continued to conduct scientific research on the San Francisco Bay population of Longfin Smelt and review and comment on management activities and threats relating to the smelt's survival.

## I.        The Longfin Smelt is on the Brink of Extinction.

The Longfin Smelt is an anadromous fish found in Pacific Coast bay, estuary, and nearshore coastal environments, from San Francisco Bay north to Cook Inlet, in south-central Alaska. The San Francisco Bay Estuary (Estuary) supports the largest Longfin Smelt population in California, which is also a distinct population segment, and the species is a key part of the estuarine food web. Longfin Smelt were once one of the most abundant open-water fishes in the Estuary and were fished commercially. In recent years, the species' numbers have plummeted to record lows in the Estuary, and it is thought to be extirpated or nearing extirpation in other Northern California estuaries.

Catastrophic declines in the Longfin Smelt population have been caused by poor management of the Estuary by Federal and State water regulators, which have allowed excessive water diversions and drastically reduced freshwater flow into San Francisco Bay. During the 1987-1992 drought, which coincided with a period of relatively high water diversions and exports from the estuary and its watershed, Longfin Smelt abundance declined dramatically, reaching historically low levels in the early 1990s. The species partially recovered during the mid-late 1990s, when hydrological conditions improved, but the population decline resumed when dry conditions and increased water diversions prevailed during the early part of this century. The Estuary's Longfin Smelt population reached a record low in 2015. Longfin Smelt abundance in 2020 (the most recent year of sampling) was <0.1% of the levels detected when sampling began in 1967, and the population has declined approximately 80% since it was listed as threatened by the State of California in 2009.

Longfin Smelt population abundance in the San Francisco Bay Estuary is directly related to the amount of fresh water flowing out of the Delta (a.k.a., Delta outflow) during the winter and spring. In years when winter and spring flows are high, Longfin Smelt have better juvenile recruitment success and relatively high population abundance, as measured later in the year, while low winter-spring flows strongly correspond to declines in abundance. Longfin Smelt are about to be extirpated from the Estuary, and the only thing that will save the species is quick, decisive action to keep enough water flowing out of the Delta to allow the smelt to survive.

///

///

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 3 of 12

##   II.      2007 Listing Petition and Subsequent Service Delays.

In November 1992, San Francisco Baykeeper and seven other organizations filed the original petition requesting the Service to list the Longfin Smelt. On June 24, 1993, the Service published its 90-day finding that the petition presented substantial information indicating that the requested action may be warranted and triggering a formal status review for the Longfin Smelt. 58 Fed.Reg. 36184 (July 6, 1993). At the time, the Service concluded that the San Francisco Estuary population of the Longfin Smelt was not a distinct population segment and this original petition was ultimately denied.

In 2007, The Bay Institute (at which Dr. Rosenfield was a consulting scientist at the time), Center for Biological Diversity ("CBD"), and Natural Resources Defense Council petitioned FWS to list the San Francisco Bay-Delta estuary population of Longfin Smelt ("Estuary population") as endangered under the federal ESA. Initially, the Service responded by denying federal protection to the Estuary population while promising to look at the status of the species as a whole. In 2009, The Bay Institute and CBD sued the Service for its denial, and in 2011, the Service announced it would rethink its decision on the Estuary population. In 2012, the Service determined that the Estuary population was a distinct population segment and that this population *warranted* protection but listing was precluded because the listing of other species was a higher priority. 77 Fed. Reg. 19756 (Apr. 2, 2012). Thus, the Service added the Estuary population to the "candidate" list.

Since 2012, the Estuary's Longfin Smelt population has remained on the candidate list. The Service has taken no further action to reconsider or move the listing forward. Instead, the Service has repeatedly found, in every year, that the Estuary population of Longfin Smelt is warranted for protection under the ESA, but that such protection is precluded by other pending listing determinations and the Service is making expeditious progress to add or remove other species from the lists.

In May 2019, the Service released its National Listing Workplan (2019 Workplan) for the subsequent five-year period. The 2019 Workplan indicated that 12-month findings for 62 identified species would be completed by FY 2020. The Service failed to complete the 12-month finding in FY 2020 for 19 of those 62 species and instead has now further delayed them until FY 2021 (15 of those species) and 2022 (four of the species).

In addition, the Longfin Smelt was one of 11 candidate species for listing that the 2019 Workplan indicated would either be proposed for listing or found not warranted for listing during the 2020 fiscal year. Of these 11 new proposed listing rules or not warranted findings, five (45%) remained incomplete as of September 30, 2020. Three of the five species whose proposed rules were not completed were identified as "Candidates in Review" in the 2020 CNOR for which "[w]e [the Service] have funded these actions and intend to complete our classification decision in the near future." 85 Fed. Reg. 73175. The two remaining species were the Longfin Smelt and the magnificent ramshorn. According

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 4 of 12

to the 2020 CNOR, the planned work for the Longfin Smelt was funded and initiated but not completed as of September 30, 2020. 85 Fed. Reg. 73171.

On November 6, 2019, the Service e-mailed a notice of status review to parties who had indicated an interest in the Longfin Smelt. The Service stated that it "has been gathering and analyzing available information about the Longfin Smelt DPS to assist us in making a listing determination." The notice indicated that "[t]he Bay-Delta Fish and Wildlife Office is the lead field office working on the status review of the Longfin Smelt Bay-Delta DPS." The notice further stated that, "[a]t this time, we expect the proposed listing rule will be delivered to the Federal Register no later than September 2020."

Given this context for the prior funding and work done by the Service on the Longfin Smelt, the explanation and date provided for the warranted but precluded finding in the 2020 CNOR is not sufficient to explain how any pending proposals to list or delist species actually precluded completion of the proposed rule for the Longfin Smelt. In addition, the 2020 CNOR fails to provide evidence demonstrating that the Service is, in fact, making expeditious progress in the process of listing and delisting other species.

Since its 12-month finding in 2012 that listing the Longfin Smelt was warranted, the Service has had a duty to determine annually whether listing the smelt is not warranted, warranted, or warranted but precluded. However, since 2012, the Service has repeatedly determined that listing the Longfin Smelt is warranted but precluded by other proposed listings and delistings. Section 1533(b)(3)(B)(iii) provides:

Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings: …
(iii) The petitioned action is warranted, but that--

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 5 of 12

16 U.S.C.A. § 1533(b)(3)(B)(iii). "The Secretary may make a 'warranted but precluded' finding only in narrow circumstances." *Wildwest Institute v. Kurth*, 855 F.3d 995, 1005 (2017). The warranted action "must be precluded by pending proposals *and* expeditious progress must be being made to list qualified species and delist those for whom ESA's protections are no longer necessary." *Ctr. for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1102 (9th Cir. 2006) (emphasis in original); *see also* 16 U.S.C. § 1533(b)(3)(B)(iii). The Service "must show that [it] is 'actively working on other listings and delistings and must determine and publish a finding that such work has resulted in pending proposals which *actually* preclude[ ] [FWS] proposing the petitioned action at that time.' " *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 838 (9th Cir. 2001) ("*Gila Chub*") (emphasis in original) (quoting H.R. Rep. No. 97-835, at 22 (1982) (Conf. Rep.)); *see also Wildwest Institute*, 855 F.3d at 1008; *Kempthorne*, 466 F.3d at 1102. The Service must "determine and present evidence that [it] is, in fact, making expeditious progress in the process of listing and delisting other species." *Gila Chub*, 254 F.3d at 838 (quoting H. Rep. No. 97-835 at 22); *see also Wildwest Institute*, 855 F.3d at 1008; *Kempthorne*, 466 F.3d at 1102. "In cases challenging the Secretary's claim of inability to propose an otherwise warranted petitioned action, the court will, in essence, be called on to separate justifications grounded in the purposes of the act from the foot-dragging efforts of a delinquent agency." H. Rep. No. 97-835, at 22.

Baykeeper intends to file an action challenging the 2020 CNOR based on the following shortcomings.

### A. The Service acted arbitrarily in publishing the 2020 CNOR because the CNOR does not provide a reasonable evaluation of the reasons and data why a listing rulemaking for the Longfin Smelt was precluded by other pending listing proposals.

The CNOR does not contain a reasonable explanation of how other relevant actions precluded publication of a rule for the Longfin Smelt in light of 2019 Workplan budgeting and the announced rulemaking date. The Service's 2019 Workplan stated that the Longfin Smelt listing rule would be promulgated by September 30, 2020, the end of fiscal year 2020. This timeline was confirmed in a November 6, 2019 e-mail to interested persons.

In the 2020 CNOR, the Service lists the criterion it finds applicable to a "precluded" determination:

in any given fiscal year (FY), multiple factors dictate whether it will be possible to undertake work on a proposed listing regulation or whether promulgation of such a proposal is precluded by higher priority listing actions—(1) The amount of resources available for completing the listing function, (2) the estimated cost of completing the proposed listing regulation, and (3) the Service's workload,

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 6 of 12

> along with the Service's prioritization of the proposed listing regulation, in
> relation to other actions in its workload.

85 Fed. Reg. 731167. The Service discusses each criterion in turn. However, the Service
fails to explain – in general, or in the focused discussion on the Longfin Smelt – how
these criteria affected completing a rule for the Longfin Smelt given its placement on the
2019 Workplan and prior decisions budgeting funds for the work.

While the Service discusses its overall listing budget, merely identifying the overall
budget and its general insufficiency does not explain how that precludes a listing
rulemaking for the Longfin Smelt, especially when the Service funded the work for
completion in FY 2020. Baykeeper understands that the listing budget in any given year
will not be sufficient to complete all of the Service's outstanding listings and delistings.
But the Service provides no evidence that budget restrictions precluded the Longfin Smelt
rule given that, according to the 2020 NOCR and the 2019 Workplan, the listing
rulemaking was budgeted.

The Service's discussion of the second criterion – the cost of completing a listing
regulation – generally identifies the types of activities that go into a listing rulemaking. The
discussion does not provide any detail regarding the cost of such activities. 85 Fed. Reg.
73617. Thus, the Service provides no evidence that it cannot complete the Longfin Smelt
listing within the Congressional budget allocation; indeed, the Service estimated that it
could complete a proposed rule by September 2020 – presumably, this plan accounted
for the costs of the Service's various listing activities within the scope of the budget it had
for listing activities.

In addition to these failures, the Service's discussion of the cost of listing
rulemakings refers to the final criterion it applies when determining whether a listing is
precluded – the Service's prioritization of the proposed listing regulation relative to its
workload. *Id.* ("Since completing all of the work for outstanding listing and critical habitat
actions has for so long required more funding than has been available within the
spending cap, the Service has developed several ways to determine the relative priorities
of the actions within its workload to identify the work it can complete with the funding it
has available for listing and critical habitat actions each year").

Applying this third prong (the Service's workload), the Service purports to rely
exclusively on the 2019 Workplan to make its preclusion determination for the Longfin
Smelt and other species. 85 Fed. Reg. 73168-69. As the 2019 CNOR states, the May
2019 Workplan "address[ed] the Act's domestic listing and critical habitat decisions over
the subsequent 5 years. The updated Workplan identified the Service's schedule for
addressing all domestic species on the candidate list and conducting 267 status reviews
and accompanying 12-month findings by FY 2023 for domestic species that have been
petitioned for Federal protections under the Act." 84 Fed. Reg. 54739. "For FY 2020, our
National Listing Workplan includes 74 12-month findings or proposed listing actions that

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 7 of 12

are at various stages of completion at the time of this finding." *Id.* One of those 74
planned actions was to promulgate a rule for the Longfin Smelt by September 30, 2020.
2019 Workplan. It is arbitrary and capricious for the Service to claim that a rulemaking for
the Longfin Smelt was precluded by its own 2019 Workplan, which prioritized rulemaking
for this species in FY 2020.

In the context of its precluded determination, the 2020 CNOR discusses the
Longfin Smelt's status and the reasoning behind the Service's assignment of listing
priority number ("LPN") 6 to the species. This discussion does not offer any explanation
that is relevant to how other pending endangered or threatened determinations precluded
a rulemaking for the Longfin Smelt. If the factors discussed in the listing priority decision
are pertinent at all, they are related to whether a Longfin Smelt listing is warranted – but
that matter is not in dispute; all parties agree that Longfin Smelt listing is warranted.

Assuming that the LPN status assigned to the Longfin Smelt is relevant to the
precluded finding, the Service's assignment of LPN 6 also is an abuse of discretion. The
warranted discussion attempts to justify the assignment of a priority level 6 to the Longfin
Smelt by pointing to various efforts by the State of California. These efforts by California,
of course, are not pending proposals by the Service and thus can never legally preclude
the Service from promulgating a listing under Section 1533(b)(3)(B)(iii)(I). Nor are the
justifications for the LPN 6 assignment supported by any evidence. The 2020 CNOR
claims that the State of California has issued an incidental take permit ("ITP") to the State
Water Project that includes protections, including winter-spring outflow requirements, that
are protective of Longfin Smelt. 85 Fed. Reg. 73173. On the contrary, the ITP identifies
persistent reductions in Longfin Smelt populations of 4 to 11% every year. Cal. Dep't of
Water Resources, "Final Environmental Impact Report for Long-Term Operation of the
Cal. State Water Project," Revisions to the DEIR, Table 4.4-10, at p. 4-180 (Nov. 22,
2019). These population reductions are significant and would generate a substantial
increase in the risk of extinction as the effects are expected to propagate through
subsequent generations. And these modeled reductions underestimate the likely decline
in abundance expected under the ITP because they are based on an erroneous
application of a population model, which Dr. Rosenfield helped develop. Furthermore, the
ITP fails to account for population declines associated with the ITP's increase in smelt
entrainment and salvage at the export pumps. Lastly, the ITP relies on habitat restoration
to increase Longfin Smelt, an assumption that lacks support in the scientific literature.
Even if one assumes habitat restoration could increase smelt numbers, there is no
evidence that any such restoration will occur in the foreseeable future especially to a
degree that would result in measurable improvements to the Longfin Smelt's survival. The
2020 CNOR also claims that the State Water Resources Control Board has adopted new
flow objectives for the lower San Joaquin and would address Delta outflow objectives in
2020. 85 Fed. Reg. 73174. However, no such Delta outflow objectives have been
forthcoming and implementation of the San Joaquin flow objectives remains incomplete;
no decision point is in sight for either of these actions. For these reasons, assigning an

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 8 of 12

LPN of six to the Longfin Smelt is not justified and does not lend support to delaying a proposed listing.

For each of these reasons, the 2020 CNOR fails to reasonably describe and evaluate the reasons and data upon which the Service based its finding that the immediate proposal and timely promulgation of a final regulation implementing the listing of the Longfin Smelt was precluded by pending proposals to determine whether any species is endangered or threatened.

> **B. Even if the discussion in the 2020 CNOR is adequate, nothing in the record for the 2020 CNOR supports the finding that completing a rulemaking for the Longfin Smelt was precluded by any other pending proposals to determine whether to list or delist species.**

Baykeeper also believes that the administrative record for the 2020 CNOR will not contain evidence establishing that a rulemaking for the Longfin Smelt was precluded by other pending proposals to determine the endangered or threatened status of other species. The Administrative Procedure Act ("APA") provides in relevant part that:

> The reviewing court shall--…
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> [or]
> (D) without observance of procedure required by law;
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C.A. § 706. The focal point of the federal court's review of an agency decision under the APA is the full record that was before the agency at the time of its decision. However, additional evidence outside of the record may be included to further explain the record or to make sure the record is complete. In particular, additional evidence is appropriate in order to disclose the factors that were considered by the agency in making its decision.

Based on currently available documents, the administrative record for the 2020 CNOR will not support a finding of preclusion for the Longfin Smelt. The Service already had prioritized the Longfin Smelt for completing the rulemaking decision by budgeting the work and establishing in the 2019 Workplan a schedule to publish the proposed rule by September 30, 2020. Baykeeper is informed and believes that, as of September 2020, the Service had made progress on preparing a proposed rulemaking for the Longfin

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 9 of 12

Smelt and that only modest additional effort should have been necessary to complete a rulemaking package prior to September 30, 2020. Baykeeper is concerned that work was ordered to be slowed down or stopped for reasons other than the Service's priorities, actual budget constraints, or the needs of the Longfin Smelt.

### C. The Service's 2020 CNOR finding that the agency is making expeditious progress to add or remove species from the endangered and threatened species list is not adequately explained and is not supported by the administrative record.

The 2020 CNOR assumes that any progress in listing or delisting species suffices to support an expeditious progress finding pursuant to Section 1533(b)(3)(B)(iii)(II). However, the term "expeditious" is defined as "done with speed and efficiency." The New Oxford American Dictionary (2d ed. 2005). Speed is a relative term the meaning of which is determined in comparison to the pace of prior agency efforts. A review of the Service's historic efforts to add and remove species from the endangered and threatened species list indicates that the Service's annual average pace of actions relating to adding and removing species from the lists has been dramatically reduced, during the four fiscal years 2017 through 2020 when compared with the five fiscal years prior to that time period.

As revealed by Federal Register notices documented in CNORs, the Service took actions to list, delist, or change listing designation of imperiled species during the most recent four years (FYs 2017-2020) at 58.5% the rate it did between FY 2012 and FY 2016. Three types of actions are necessary to add species to the lists. These include initial findings (90-day petition findings), intermediate findings (12-month determinations and proposed rules), and final actions (final listing rules). Expeditious progress also includes removing species from the lists. Reviewing all relevant Federal Register notices identified by the Service in its CNORs, the Service took 218 actions in furtherance of listing or delisting species between fiscal years 2012 and 2016. This is an average of 43.6 actions per year for that five-year period of time. By contrast, from FY 2017 through 2020, a tally of the same listing and delisting actions documents 102 actions, or 25.5 actions per year for that four-year period.

The reduction in listing-related actions is apparent across types of listing actions (see figure below). From 2017 through the most recent CNOR, the rate at which the Service published Federal Register notices with final listing rules declined by 40.5 percent compared to the rate from 2012 through 2016. Likewise, for those periods, there was a 66.2 percent reduction in the number of Federal Register notices presenting 90-day findings. This dramatic deceleration of listing activities combined with a focus on the lower priority delistings and downlistings does not support the Service's finding of expeditious progress.

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 10 of 12

The decline in the Service's listing activity is even more dramatic if one looks at the number of species processed instead of the number of Federal Register notices published. In many cases, the Service dealt with listing activities for more than one species in a single Federal Register notice. The total number of species-specific listing activities between 2012 and 2016 was 1,206 for an annual rate of 241.2 species-actions per year. That rate declined by 77.1% between 2017 and 2020, as the Service took only 221 species-actions during that entire time period (less than the single year average in the preceding period). On average, the Service issued 90-day findings for 118 species per year during 2012-2016, but only 6.5 per year between 2017 and 2020 – a drop of 94.5%. Similarly, final listing rules were issued for 53.2 species per year between 2012 and 2016, on average; yet less than 1/5th as many final rules (9.5 per year) were issued in the period 2017-2020.

Slower progress is not expeditious progress. The 2020 CNOR does not acknowledge the dramatic reduction in listing activity nor does it provide any explanation for this pattern. This substantial reduction in the pace of activities relevant to the Service's expeditious progress finding demonstrates that as of the 2020 CNOR, the Service was not making expeditious progress and, indeed, has not been making expeditious progress for the past four years.

Presumably, the 2019 Workplan and prior workplans also serve as objective forecasts by the Service of reasonable expectations of progress, factoring in its budget and priorities. Putting aside whether the 2019 Workplan or prior workplans were intended to or in fact meet the expeditious progress standard, where the Service fails to achieve its own workplans is substantial evidence that the Service is falling behind further and not making expeditious progress on adding or removing species.

The budget constraints claimed in the 2020 CNOR do not explain the significant deceleration of the Service's listing and delisting activities. According to fiscal year budgets identified in the CNORs between FY 2012 and FY 2016, the average annual budget cap for listing activities was $20,688,800; between 2017 and 2020, the average annual cap was $19,492,250, a reduction of approximately 5.8%. A drop in Congressional allocation to listing activities cannot account for the much greater decline in listing actions. Actions either to delist or downlist species are not subject to these budget limits, as they are funded through a separate recovery line item in the federal budget. 85 Fed. Reg. 73619. Nor are delisting and downlisting activities included in the Service's prioritization of listing actions. *Id.* at 73168. Thus, an increase in delisting and downlisting activities does not justify any reductions in the other listing activities. Removing the delisting and downlisting actions from our tabulation, Federal Register notices detailing the remaining listing-related actions declined by 57% during 2017 through 2020 as compared to 2012 through 2016 (see figure below). Excluding delistings and downlistings, the number of species-actions dropped by 79.9% in the last 4 years compared with the 2012-2016 period. The increase in delisting and downlisting activities over the last four years does not explain how a similar budget resulted in far fewer listing-related actions. There is no

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 11 of 12

explanation in the CNOR why a slight reduction in budgeting (5.8% lower) in the last four years would result in a steep drop-off in listing-related actions, especially when not including delistings and downlistings.



Furthermore, the 2020 CNOR does not explain why actions in the 2019 Workplan were not completed, despite an increase in the FY 2020 Congressional cap on listing activities. The 2020 CNOR reports a total budget cap of $20,318,000 for all foreign and domestic listing work in FY 2020. This was exactly two million dollars more than the Congressional cap in the previous year (representing a year-to-year increase in the Congressional spending cap of 10.9%), and yet the Service still did not accomplish the actions it proposed just one year earlier, in the 2019 Workplan, for completion during FY 2020. There is no explanation in the 2020 CNOR of how the increased budget in 2020, relative to prior years, was insufficient to accomplish the work budgeted in the 2019 Workplan.

An abrupt slowdown in listing actions also demonstrates the Service's failure to make expeditious progress on its listing actions. Between 2012 and 2016, the Service took between 77 and 628 species-specific listing actions each year. In 2017, the number of those actions plummeted to 41 actions and did not exceed 64 actions in any year between 2016 and 2020. In other words, the Service issued fewer listing-related decisions  in every year between 2016 and 2020 than it did in each of the preceding 5 years – far fewer in most years. Even if the Service is presumed to have been pursuing its listing duties with speed and efficiency prior to 2016, this documented drop-off clearly demonstrates a failure to maintain that standard. This abrupt reduction in listing-related actions is thus strong evidence of a lack of expeditious progress which has persisted through the most recent CNOR.

San Francisco Baykeeper Notice of Intent to Sue
Re: Longfin Smelt
March 8, 2021
Page 12 of 12

For these reasons, the 2020 CNOR's description and evaluation of the reasons and data supporting the Service's expeditious progress finding is inadequate and unreasonable. Moreover, Baykeeper is informed and believes and thereupon alleges that the Service's expeditious progress determination is not supported by evidence in the administrative record and is arbitrary and capricious.

## III.    Conclusion.

The Secretary's determinations in the 2020 CNOR that the timely promulgation of a final regulation listing the Longfin Smelt as endangered or threatened was precluded by other pending listing determinations and that the Service has been making expeditious progress to add or remove species from the endangered and threatened species lists are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. In making these determinations, the Service has neither considered the relevant factors nor articulated a rational connection between the facts found and the choices made. In addition, the description and evaluation of the reasons and data published in the 2020 CNOR are not sufficient to describe sufficient facts and reasons supporting the determination that the Longfin Smelt listing rule was precluded and that the Service has been making expeditious progress on listings and delistings. Baykeeper requests that the Secretary immediately commit to a legally binding timeline requiring the promulgation of a proposed listing rule for the Longfin Smelt by not later than September 1, 2021 and adopt a final rule by not later than March 1, 2022. Pending a legally binding commitment to complete the listing rulemaking for the Longfin Smelt, Baykeeper intends to file suit addressing the Service's abuse of discretion in delaying the ESA protections that are long overdue for the Longfin Smelt.  Please contact me or Baykeeper Staff Attorney Ben Eichenberg (510-735-9700 x. 105; ben@baykeeper.org) if you have any questions regarding the issues raised in this notice or would otherwise like to discuss this matter.

Sincerely,

Michael R. Lozeau
Lozeau Drury LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200; E-mail: michael@lozeaudrury.com

on behalf of San Francisco Baykeeper